*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* DAWSON, Minors.

UNPUBLISHED
April 08, 2026
2:32 PM

Nos. 375588; 376447
Wayne Circuit Court
Family Division
LC No. 2022-001217-NA

Before: KOROBKIN, P.J., and YOUNG and BAZZI, JJ.

PER CURIAM.

In these consolidated appeals, in Docket No. 375588, respondent-mother appeals as of right the order terminating her parental rights to GJD and ARD, under MCL 712A.19b(3)(c)(*i*) (conditions that led to removal still existed and were unlikely to be remedied in a reasonable period of time), (g) (parent was financially able to care for child but failed to do so), and (j) (reasonable likelihood of harm to child). In Docket No. 376447, respondent-father appeals as of right the same trial court order terminating his parental rights to GJD and ARD under MCL 712A.19b(3)(c)(*i*), (g), and (j). We affirm.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Respondent-mother and respondent-father were homeless from 2015 until 2023. They intermittently stayed in homeless shelters and hotels. Respondent-father used illicit substances including heroin, did not have an income, and suffered from anxiety and depression. Respondent-father panhandled to get money to buy drugs and had been panhandling with GJD and ARD. In May 2022, respondent-mother was prescribed medication for her diagnoses of attention-deficit/hyperactivity disorder (ADHD), bipolar disorder, asthma, and anxiety, but she did not take the medication.

On July 23, 2022, when respondent-mother, GJD, and ARD were living in a shelter, GJD and respondent-mother got into a fight. Respondent-mother hit GJD with a broom, smashed his phone, and grabbed his arm. In early August 2022, respondent-mother was asked to leave the

-1-

shelter. Respondent-mother, GJD, and ARD spent a night at a bus stop in Detroit after they visited respondent-father who was sleeping on the grass near a 7-Eleven convenience store.

Respondent-mother, GJD, and ARD stayed with their maternal grandmother for a few days. On August 8, 2022, the grandmother stated that she did not want them to live with her anymore because respondent-mother was abusive to the grandmother, GJD, and ARD. The Department of Health and Human Services (DHHS) filed an ex parte motion asking the trial court to take protective custody of GJD and ARD. The trial court determined that it was contrary to the welfare of GJD and ARD for them to remain in respondents' care.

On August 29, 2022, DHHS petitioned for temporary custody of GJD and ARD. Respondent-mother and respondent-father pleaded no contest to the facts establishing jurisdiction. The trial court ordered them to undergo psychological and psychiatric evaluations, follow the recommendations from the evaluations, participate in and benefit from individual counseling and parenting classes, and maintain a legal source of income and suitable housing. Respondent-father was ordered to have a substance-abuse assessment, follow the recommendations from the assessment, and participate in random drug screens. Respondent-mother was ordered to participate in the parent-partner program. Respondents were ordered to participate in supervised parenting visits with ARD, but parenting visits with GJD were at his discretion and only if his therapist advised that they occur.

In August 2023, respondents obtained housing but were still working on the other aspects of their case service plans. A few months later, ARD was placed in the foster home where GJD was placed. In April 2024, respondent-mother, respondent-father, and ARD participated in two family therapy sessions. GJD refused to participate. At some point in April 2024, ARD went to the hospital because she was suicidal and homicidal. ARD stayed in the hospital for two weeks. The family therapy and parenting visits with ARD were suspended following a recommendation from ARD's psychiatric report.

A supplemental petition for permanent custody was filed on September 10, 2024. A termination hearing was held on March 10, 2025. Laura Francoeur, a foster care specialist, testified that respondents had not completed their case service plans or removed the barriers that brought GJD and ARD into care. Although they had suitable housing, respondents were not able to show they benefitted from parenting classes. Respondent-mother did not complete individual therapy, the parent-partner program, or follow the recommendations from her psychiatric evaluation. Respondent-father had not successfully participated in the substance-abuse assessment and drug screens. Throughout the supervision under the case service plan, his drug screens were positive for fentanyl, heroin, tetrahydrocannabinol (THC), and alcohol. Respondent-father continued to be unemployed and had no legal source of income.

Respondent-mother testified that she had completed her case service plan. She stated that she no longer had any mental-health issues and that she was not recommended to complete any follow up after the psychiatric evaluation. Respondent-father testified that he had benefitted from the parenting classes and that he had not used heroin for a year and a half. The trial court determined that there was clear and convincing evidence to terminate respondents' parental rights under MCL 712A.19b(3)(c)(*i*),(g), and (j).

A best-interests hearing was held on May 12, 2025. Francoeur testified that it was in the best interests of the children to terminate respondents' parental rights. Respondents again both testified in their defense. The trial court determined that it was in GJD's and ARD's best interests to terminate respondents' parental rights because there was no bond between them and the children, respondents had not demonstrated proper parenting or complied with their service plans, the children each had special needs that were being met in their foster home, and the children needed permanency. These appeals followed.

## II. THERE WAS CLEAR AND CONVINCING EVIDENCE SUPPORTING TERMINATION

Respondents argue that the trial court clearly erred by finding clear and convincing evidence supporting statutory grounds for termination of their parental rights to GJD and ARD. We disagree.

### A. STANDARD OF REVIEW

"This Court reviews for clear error the trial court's ruling that a statutory ground for termination has been established and its ruling that termination is in the children's best interests." *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011). A finding of fact is "clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed." *In re Mota*, 334 Mich App 300, 320; 964 NW2d 881 (2020) (quotation marks and citation omitted). "When applying the clear-error standard in parental termination cases, regard is to be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." *Id*. (quotation marks and citations omitted).

### B. THERE WAS CLEAR AND CONVINCING EVIDENCE TO SUPPORT TERMINATING RESPONDENT-MOTHER'S PARENTAL RIGHTS

To terminate parental rights, "the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). "Only one statutory ground for termination need be established" to terminate a respondent's parental rights. *In re Olive/Metts Minors*, 297 Mich App 35, 41; 823 NW2d 144 (2012).

The trial court found there was clear and convincing evidence to establish statutory grounds for termination of respondent-mother's rights to GJD and ARD under MCL 712A.19b(3)(c)(*i*), (g), and (j), which provide:

> The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> \* \* \*
>
> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

\* \* \*

(g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

\* \* \*

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if the child is returned to the home of the parent.

The trial court properly found at least one statutory ground to terminate respondent-mother's parental rights. Under MCL 712A.19b(3)(c)(*i*), termination of parental rights is established when the conditions that brought the child into care continue to exist despite a respondent being given "time to make changes and the opportunity to take advantage of a variety of services . . . ." *In re White*, 303 Mich App 701, 710; 846 NW2d 61 (2014). In other words, termination of parental rights is proper when "the totality of the evidence amply supports that [the respondent] ha[s] not accomplished any meaningful change in the conditions" that led to the adjudication. *In re Williams*, 286 Mich App 253, 272; 779 NW2d 286 (2009).

First, in this case, more than 182 days had elapsed since the issuance of an initial dispositional order. The initial dispositional order was issued on January 27, 2023. DHHS petitioned to terminate respondent's parental rights to GJD and ARD on September 10, 2024—592 days later. Next, one of the conditions that led to adjudication was respondent-mother's mental health. To address her mental-health issues, respondent was ordered to participate in individual therapy, undergo psychological and psychiatric evaluations, and follow the recommendations from these evaluations. The recommendation from her psychological evaluation was to participate in parenting coaching, have supportive visitation, and continue individual therapy. According to Francoeur, respondent-mother did not successfully complete individual therapy. Respondent-mother had not followed the recommendations from the psychiatric evaluation including taking prescribed medication and she was not participating in services to address her mental health. There was no indication that respondent's mental health was under control.

Respondent-mother contends that her mental-health issues were resolved and that she completed her case service plan. Specifically, respondent-mother claimed that the psychiatric evaluation produced no diagnosis and that she was not required to take medication for her mental health. According to respondent-mother, she stopped taking medication for her mental health diagnoses in 2022, before the adjudication trial, because she was no longer prescribed any medication. However, evidence in the record contradicts respondent-mother's claim. According to the CPS investigation report that respondent-mother accepted as a factual basis for her no-

contest plea to jurisdiction, on May 22, 2022, respondent-mother was prescribed Vyvanse, Topamax, and Seroquel for her diagnoses of ADHD, bipolar disorder, asthma, and anxiety. Respondent-mother did not take "the medication as prescribed . . . ."

Deferring to the trial court's special opportunity to judge the witnesses' credibility, *Mota*, 334 Mich App at 320, it found that respondent-mother "failed to follow through with recommendations of court-ordered psychiatric evaluation, resulting in her mental health issues continuing to go untreated." Because she did not follow the recommendations from the psychiatric evaluation or participate in individual therapy, respondent-mother did not accomplish any meaningful change in her mental health and therefore her ability to care for the children. *Williams*, 286 Mich App at 272. Respondent-mother was given "time to make changes and the opportunity to take advantage of a variety of services" to help make those changes. *White*, 303 Mich App at 710. Although respondent-mother completed the parenting classes and some of the other court-ordered services, she failed to address her mental health. In light of respondent-mother's refusal to recognize that her mental health was an issue after 2022, even if she was provided with more time and additional referrals to services, it is unlikely that respondent-mother would be able to achieve any substantive improvements to her mental health in a reasonable time. In the two years that elapsed between the date that respondent-mother was adjudicated in this case and the date of the termination hearing, she failed to complete individual therapy and follow the recommendations from the psychiatric evaluation. In fact, at the time termination occurred, respondent-mother openly acknowledged she was not participating in individual therapy and had not requested a referral for a different therapist.

As respondent-mother argues on appeal, she complied with other aspects of her case service plan. Respondent mother had social security disability income and suitable housing. However, respondent-mother's untreated mental health issues threaten to destabilize these improvements. Specifically, respondent-mother's mental health could lead to the loss of her social security disability income, which in turn could again lead to homelessness. Additionally, respondent-mother completed parenting classes, which was part of her case service plan. Nevertheless, she had the responsibility to demonstrate benefit from parenting classes. Despite warnings that she should not be making promises to ARD about when she would come home, respondent-mother continued to have inappropriate conversations with ARD during parenting visits. This demonstrates that she failed to benefit from the parenting classes and improve her parenting ability.

Therefore, the trial court did not clearly err in concluding that termination of respondent's parental rights to GJD and ARD was appropriate under MCL 712A.19b(3)(c)(*i*). *Hudson*, 294 Mich App at 264. We decline to consider the remaining statutory grounds because "[o]nly one statutory ground for termination need be established" to terminate a respondent's parental rights. *Olive/Metts Minors*, 297 Mich App at 41.

## C. THERE WAS CLEAR AND CONVINCING EVIDENCE TO SUPPORT TERMINATING RESPONDENT-FATHER'S PARENTAL RIGHTS

The trial court properly found at least one statutory ground to terminate respondent-father's parental rights.

Respondent-father's substance abuse was one of the conditions that led to his adjudication. To address his substance-abuse issues, the trial court ordered him to complete a substance-abuse assessment, follow the recommendations from the substance-abuse assessment, and participate in weekly, random drug screens. Although respondent-father was seeking treatment at a methadone clinic since before August 2023, he did not have a path to be cleared from using methadone as of March 2025. Respondent-father asserted that he anticipated going to the methadone clinic for another 6 to 12 months. Contrary to respondent-father's assertion on appeal that his substance abuse was under control, during his supervision under the case service plan, respondent-father tested positive for fentanyl, heroin, THC, and alcohol. Despite receiving methadone treatment for more than a year, respondent-father's substance-abuse issues were not under control. Along with the drug screens that showed respondent-father was still abusing substances, the many drug screens that respondent-father missed during the supervision of the case service plan were presumed positive. Notably, during one reporting period, respondent-father missed all of the drug tests. During another reporting period, he missed 10 of the 12 drug tests. More than two years after the case service plan was ordered, respondent-father continued to engage in the same behavior and was still dependent on substances, demonstrating that he failed to accomplish meaningful change in his ability to care for GJD and ARD. *Williams*, 286 Mich App at 272.

Another condition that led to respondent-father's adjudication was his failure "to provide proper or necessary support or care for the children . . . ." To address this condition, the trial court ordered respondent-father to maintain a "legal source of income, and suitable housing," and "take parenting classes." Although respondent father attended parenting classes and obtained suitable housing by the time of the termination hearing, he still did not have a legal source of income and was unable to financially support his children with their necessities. Respondent-father completed parenting classes, but, as Francoeur testified, failed to establish a benefit from them. Thus, respondent-father did not accomplish any meaningful change in his failure to provide support for the children. *Williams*, 286 Mich App at 272.

In light of respondent's failure to comply with the case service plan, address his substance-abuse issue, and obtain legal income, it was unlikely that he would do so in a reasonable time. In the two years that elapsed between the date respondent-father was adjudicated and the date of the termination hearing, respondent-father failed to establish a legal source of income or successfully complete the substance-abuse assessment and drug screens. Therefore, the trial court did not clearly err in concluding that termination of respondent's parental rights to GJD and ARD was appropriate under MCL 712A.19b(3)(c)(*i*). *Hudson*, 294 Mich App at 264.

Because "[o]nly one statutory ground for termination need be established" to terminate a respondent-father's parental rights, we decline to consider the remaining statutory grounds. *Olive/Metts Minors*, 297 Mich App at 41.

### III. DHHS MADE REASONABLE EFFORTS TO REUNIFY RESPONDENTS WITH THE CHILDREN

Respondents contend that the trial court did not make reasonable efforts to provide services for reunification. We disagree.

## A. ISSUE PRESERVATION

"In order to preserve an argument that petitioner failed to provide 'adequate services,' the respondent must 'object or indicate that the services provided to them were somehow inadequate . . . .' " *In re Atchley*, 341 Mich App 332, 336; 990 NW2d 685 (2022), quoting *In re Frey*, 297 Mich App 242, 247; 824 NW2d 569 (2012). "The time for asserting the need for accommodation in services is when the court adopts a service plan . . . ." *Atchley*, 341 Mich App at 336, quoting *In re Terry*, 240 Mich App 14, 27; 610 NW2d 563 (2000). "However, even if a parent does not object or otherwise indicate that the services provided were inadequate when the initial case services plan is adopted, such an objection or challenge may also be timely if raised later during the proceedings." *Atchley*, 341 Mich App at 337. Respondent-mother failed to object or indicate that the services provided to her were somehow inadequate, thereby failing to preserve this issue. *Id*. In a dispositional review hearing, respondent-father asked the trial court for family therapy and visitation to work on reunification with GJD and ARD, so he preserved the issue for appellate review.

## B. STANDARDS OF REVIEW

When the issue is preserved, we review "for clear error the trial court's factual finding that petitioner made reasonable efforts to reunify respondent[] with the child." *Atchley*, 341 Mich App at 338. However, when a challenge to a trial court's finding of reasonable efforts is unpreserved, we review the trial court's decision "for plain error affecting substantial rights." *Id*. (citation omitted). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) the error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *VanDalen*, 293 Mich App at 135 (quotation marks and citation omitted). "[A]n error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *In re Utrera*, 281 Mich App 1, 9; 761 NW2d 253 (2008).

## C. RESPONDENT-MOTHER

"Reasonable efforts to reunify the child and family must be made in all cases except those involving aggravated circumstances." *In re Simonetta*, 340 Mich App 700, 707; 987 NW2d 919 (2022) (quotation marks and citation omitted). Neither party argues that aggravated circumstances existed in this case, thus "termination is improper without a finding of reasonable efforts." *In re Hicks/Brown*, 500 Mich 79, 90; 893 NW2d 637 (2017). "As part of these reasonable efforts, [DHHS] must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *Id*. at 85-86. A case service plan, often referred to as a parent/agency agreement, "includes services to be provided by and responsibilities and obligations of the agency and activities, responsibilities, and obligations of the parent." MCL 712A.13a(1)(d). "While [DHHS] has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *Frey*, 297 Mich App at 248.

Respondent-mother's mental-health issues were the primary barrier to reunification, and the record shows that DHHS made reasonable efforts to help respondent-mother overcome this issue. DHHS expended reasonable efforts to secure reunification by recommending and referring respondent-mother for a service plan "outlining the steps that both it and the parent will take to

rectify the issues that led to court involvement and to achieve reunification." *Hicks/Brown*, 500 Mich at 85-86. DHHS provided respondent-mother with multiple referrals for individual therapy, along with psychiatric and psychological evaluations. Although respondent-mother began participating in individual therapy, she did not complete it. She claimed that her therapist had to discontinue therapy with her because "he was a married man," though she "was not having a relationship with him[.]" Respondent-mother did not notify any of the foster care workers that she needed a referral for a new therapist or seek to complete individual therapy. Respondent-mother completed the psychological and psychiatric evaluations, but she failed to follow the recommendations, which she was ordered to do, including taking prescribed medication. Respondent-mother did not complete the parent-partner program.

"Although DHHS has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of the respondent-parent to participate in the services and demonstrate having benefited from them." *In re MJC*, 349 Mich App 42, 61; 27 NW3d 122 (2023). The parent must "demonstrate sufficient compliance with or benefit from those services specifically targeted to address the primary basis for the adjudication . . . ." *Frey*, 297 Mich App at 248. In this case, respondent-mother participated in some of the services offered, but she failed to benefit from them. Moreover, because this issue is unpreserved, respondent-mother has the burden of proving any error caused her prejudice. *MJC*, 349 Mich App at 48. She has failed to meet that burden because she has not specified any additional services DHHS could have provided for her that would have better helped her to overcome her mental-health issues.

Respondent-mother argues that the trial court failed to provide reasonable efforts at reunification when it failed to give her adequate time to comply with the case service plan. We disagree. Respondent-mother was given more than two years to address her mental health issues. Yet, after two years, respondent-mother refused to acknowledge that her mental health was a cause for concern. Thus, it is unlikely that additional time would have promoted reunification with GJD and ARD. Therefore, there was no plain error in the trial court's determination regarding reasonable efforts. *MJC*, 349 Mich App at 57.

Next, respondent-mother argues that she should have been offered family therapy to promote reunification with GJD and ARD. We disagree because this would not have helped her to overcome her mental-health issues.

In April 2024, respondent-mother, respondent-father, and ARD participated in two family therapy sessions. GJD was not involved in this therapy because he refused to participate. The family therapy sessions stopped when ARD went to the hospital that same month because she was suicidal and homicidal. ARD stayed in the hospital for two weeks. At the next dispositional review hearing, the trial court determined that all parenting visits and contact would be "at the discretion of the children." Specifically, regarding family therapy, the trial court stated, "Family therapy is suspended unless requested by the children and then at workers discretion." From that point, GJD and ARD did not want to visit with respondent-mother. Although family therapy could have promoted the parental bond between respondent-mother and the children, respondent-mother fails to demonstrate how family therapy would have helped her "rectify the issues that led to court involvement and to achieve reunification." *Hicks/Brown*, 500 Mich at 85-86. Respondent-mother did not engage in individual therapy to address her mental health, so it is unclear how family

therapy would have addressed this concern. The family therapy would likely not have helped respondent-mother overcome her mental-health issues, so respondent-mother has not established plain error. *MJC*, 349 Mich App at 57.

## D. RESPONDENT-FATHER

The trial court noted that the children came into care because of respondent-father's substance-abuse issues. Respondent-father was ordered to participate in services to address these issues. He was referred for a substance-abuse assessment and random drug screens.

According to Francoeur, respondent-father did not successfully participate in substance-abuse assessment and drug screens. Although respondent-father claimed that he completed the case service plan and that his treatment in the methadone clinic was sufficient progress with the case service plan, the trial court found respondent-father's testimony to not be credible. We defer to the trial court's special opportunity to judge the witnesses' credibility. *Mota*, 334 Mich App at 320.

Further, additional evidence demonstrated that respondent-father failed to benefit from the case service plan. Despite claims that he had his substance use under control, respondent-father continued to test positive for fentanyl, heroin, THC, and alcohol in his drug screens. The parent must "demonstrate sufficient compliance with or benefit from those services specifically targeted to address the primary basis for the adjudication . . . ." *Frey*, 297 Mich App at 248. Respondent-father failed to benefit from the case service plan, especially related to his substance abuse. A review of the record confirms that, under the circumstances in this case, DHHS efforts were reasonable and designed to remove the barriers to reunification.

Respondent-father claims that he should have been provided with parenting visits and family counseling to support his reunification with GJD and ARD. We disagree because these services would not have helped respondent-father address the primary barrier to reunification with his children: his substance abuse.

Respondent-father's visitation with GJD was suspended in October 2022. Family therapy with respondents and ARD initially started in April 2024 but stopped because of ARD's two-week hospital stay. The family therapy and visitation with ARD were suspended in May 2024, after ARD's psychiatric evaluation recommended that ARD's contact with respondents be suspended. Although respondent-father expressed his desire to continue the parenting visits and the family therapy, the efforts to reunify respondent-father with the children were reasonable because these services would not have helped respondent-father overcome his barriers to reunification. The suspension of the parenting visits and family therapy did not contribute to respondent-father's failure to benefit from substance-abuse treatment. Consequently, even if the trial court had permitted visitation and family therapy sessions to continue, it is unlikely that the result would have been different in light of respondent-father's failure to demonstrate that he addressed the primary issue which was directly related to whether GJD and ARD would be safe in his care.

"If the court determines that parenting time, even if supervised, may be harmful to the juvenile's life, physical health, or mental well-being, the court may suspend parenting time until the risk of harm no longer exists." MCL 712A.13a(13). In this case, the trial court determined

that it was harmful to ARD to continue any contact with respondents after ARD displayed signs of stress, including nightmares and outbursts, in the times surrounding parenting visits. Additionally, after two family therapy sessions, ARD was homicidal and suicidal. It was reasonable for the family therapy visits to be suspended after ARD's reaction raised a concern for her mental well-being. If respondent-father would have exhibited a better ability to protect the mental health of the children by showing improvements with his substance-abuse issues, then it would have been reasonable to reattempt family therapy and parenting visits. Because respondent-father did not—or could not—improve his substance abuse issues with the provision of reasonable services from DHHS, the decision to forego the requested family therapy was reasonable. Therefore, the trial court did not clearly err when it found that reasonable efforts were made toward reunification. *Atchley*, 341 Mich App at 338. Respondent-father was either unwilling or unable to take advantage of and benefit from the substance-abuse services offered. *Frey*, 297 Mich App at 248.

## IV. TERMINATION IS IN THE CHILDREN'S BEST INTERESTS

Respondents argue that the trial court erred in terminating their parental rights to GJD and ARD children because it was not in their best interests. We disagree.

### A. STANDARD OF REVIEW

We review the trial court's findings that termination is in a child's best interests for clear error. *White*, 303 Mich App at 713.

### B. RESPONDENT-MOTHER

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *Olive/Metts*, 297 Mich App at 40. "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). "In deciding whether termination is in the child's best interests, the court may consider the child's bond to the parent[;] the parent's parenting ability[;] the child's need for permanency, stability, and finality[;] and the advantages of a foster home over the parent's home." *Olive/Metts*, 297 Mich App at 41-42 (citations omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *White*, 303 Mich App at 714. The trial court "should weigh all the evidence available to it." *In re Payne/Pumphrey/Fortson*, 311 Mich App 49, 63; 874 NW2d 205 (2015). "The focus at the best-interest stage has always been on the child, not the parent." *Id*. (quotation marks and citation omitted).

The trial court did not clearly err in determining that termination of respondent-mother's parental rights was in GJD's and ARD's best interests. *White*, 303 Mich App at 713. Francoeur testified that the children did not have a bond with respondent-mother. Respondent-mother had an "unhealthy relationship" with ARD which included respondent-mother "looking to the child for approval, age-inappropriate conversation, which seemed parentified in nature and at times focused on her, rather than the child." The children's desire not to have contact with respondent-mother

demonstrates the lack of bond between the children and respondent-mother. Although respondent-mother believed that she had a "perfect bond with [ARD]," and she felt a bond with GJD, the record demonstrated that neither GJD nor ARD had any visits with respondent-mother in over a year because they did not want any contact with her. The trial court found respondent-mother's testimony to be not credible. Thus, the evidence showed that the bond between respondent-mother and the children was not healthy for GJD or ARD, which weighs in favor of termination. *White*, 303 Mich App at 714.

Respondent-mother's parenting ability likewise weighed in favor of termination. *Id*. Respondent's physical abuse of GJD initially led to the trial court's involvement in this case. "The doctrine of anticipatory neglect recognizes that [h]ow a parent treats one child is certainly *probative* of how that parent may treat other children." *In re Kellogg*, 331 Mich App 249, 259; 952 NW2d 544 (2020) (quotation marks and citation omitted; alteration in original). Accordingly, how respondent-mother treated GJD was indicative of how she may treat ARD, especially in light of her failure to benefit from the parenting classes. *Id*. Although she participated in parenting classes to improve her parenting ability, according to Francoeur, respondent-mother failed to establish benefit from the classes. She also failed to participate in the parent-partner program. Respondent-mother had the responsibility to demonstrate having benefited from the services. *MJC*, 349 Mich App at 61. Additionally, respondent-mother's parenting ability was concerning in light of her visitation history with ARD. Before the visits with ARD were suspended, respondent-mother repeatedly engaged in inappropriate conversations such as telling ARD that she did not need to love her foster parents and making promises to ARD about when she would come home. This indicates a lack of awareness about how this would affect ARD.

Respondent-mother's visitation history weighs in favor of termination. *White*, 303 Mich App at 714. Her parenting visits were suspended for GJD because he refused to have contact with respondent-mother and GJD's therapist recommended that the visits be suspended. After ARD displayed signs of stress, including nightmares and outbursts, in the times surrounding parenting visits, the parenting visits with ARD were suspended. With respect to respondent-mother's visitation history with ARD before the visits were suspended, her attendance and participation were positive, but respondent-mother repeatedly engaged in inappropriate conversations including making promises to ARD about when she would come home.

Meanwhile, both GJD's and ARD's need for permanency, stability, and finality weighed in favor of termination. *Olive/Metts*, 297 Mich App at 41-42. The caregiver was willing to continue providing care to the children and was open to the possibility of adoption. *White*, 303 Mich App at 714. ARD had special needs including autism spectrum disorder, ADHD, anxiety, and avoidant restrictive food intake disorder, which required long-term care by a stable individual. GJD was in treatment for anxiety and depression, and his needs were being met in the foster placement. GJD was engaged in sports, which were therapeutic to him. The caregiver was meeting GJD's and ARD's medical and emotional needs. ARD struggled with her behaviors and outbursts, but the frequency and duration of ARD's tantrums lessened after her hospitalization in April 2024. According to Francoeur, respondent-mother was unable to care for the children's special needs. Thus, the advantages of the foster home over the parent's home also weighed in favor of termination. *Olive/Metts*, 297 Mich App at 41-42.

Respondent-mother's failure to comply with the mental-health portion of her case service plan also weighs in favor of termination. *White*, 303 Mich App at 714. Respondent-mother was ordered to complete the parent-partner program and individual therapy, which she failed to do. Respondent-mother did not follow the recommendation from her psychiatric evaluation to take medications for her mental-health diagnoses. Instead, respondent-mother denied that she still had mental-health issues and that she needed medication after 2022. Respondent's success in obtaining housing, which was part of the case service plan weighs against termination. *Id*.

The trial court determined that termination of respondent-mother's parental rights was in GJD's and ARD's best interests. The trial court considered the lack of bond, respondent-mother's parenting ability, compliance with her case service plan, GJD's and ARD's special needs that were being met by the caregiver, and the children's need for permanency. As the trial court properly considered the best-interest factors in concluding that termination was in the children's best interests and used the evidence produced to conclude those factors favored termination, the trial court did not clearly err in terminating respondent-mother's parental rights. *White*, 303 Mich App at 709.

C. RESPONDENT-FATHER

Termination of respondent-father's parental rights was in the best interests of the children. *Id*. at 713. Although respondent felt bonded with GJD and ARD, there was evidence demonstrating that this bond was unhealthy. Francoeur testified that the children did not have a bond with respondent-father. When discussing respondent father, ARD stated, "[Respondent-father] brings up bad memories too." The best-interest assessment for respondent-father revealed an "unhealthy relationship between [respondent-father] and [ARD]." In a conversation with ARD for the best-interest assessment, respondent-father's behavior "seemed odd, emotionally manipulative, inappropriate and concerning in nature, as it seemed to be repeatedly seeking for a response." Thus, the trial court's determination that there was no bond was not clearly erroneous. *Id*. This weighed in favor of termination. *Olive/Metts*, 297 Mich App at 41-42.

Respondent-father's parenting ability likewise weighed in favor of termination. *Id*. Respondent-father's substance abuse affected his ability to parent, which he recognized at the adjudication trial. Respondent-father admitted that he had been "panhandling" with GJD and ARD. Additionally, respondent-father's failure to gain income or employment demonstrates that he was unable to provide for the children's basic needs, which is an essential parenting skill. Although respondent-father completed parenting classes, which were an opportunity to improve his parenting ability, he failed to establish benefit from them. Because he failed to benefit from substance-abuse treatment and parenting classes, his parenting ability continued to be concerning. As explained above, respondent-father had the responsibility to demonstrate that he benefitted from the services provided. *Frey*, 297 Mich App at 248.

Contrary to respondent-father's assertions, he failed to comply with the substance-abuse part of his case service plan. Additionally, respondent-father failed to obtain a legal source of income, which he was ordered to do. This weighed in favor of termination. *White*, 303 Mich App at 714.

As discussed above in the context of the children's best interests related to respondent-mother's parental rights, both GJD's and ARD's need for permanency, stability, and finality weighed in favor of termination. *Olive/Metts*, 297 Mich App at 41-42. Comparing the advantages of the foster placement over respondent-father's home, Francoeur explained that respondent-father was unable to care for the children's special needs. Particularly, respondent-father did not have his substance-abuse issues under control, which was essential to being able to deal with ARD's emotional needs. Accordingly, the advantages of the foster home over respondent-father's care also weighed in favor of termination. *Olive/Metts*, 297 Mich App at 41-42.

Respondent argues that GJD and ARD were "not going to be adopted." Respondent-father further asserts that GJD's and ARD's special needs are too intense, DHHS "had difficulty finding placement for both kids," and GJD was "on the delinquency docket." There is no evidence in the record that supports respondent-father's contention that the children were having difficulty being placed, that GJD was on a delinquency docket, or that the children were not able to be adopted. Rather, the caregiver indicated that she was "willing to keep both children in her home . . . ." Thus, this likewise weighs in favor of termination. *White*, 303 Mich App at 714.

The trial court considered the best-interest factors in determining that termination of respondent-father's parental rights was in GJD's and ARD's best interests, and used the evidence produced to conclude those factors favored termination. Therefore, the trial court did not clearly err when it determined that it was in GJD's and ARD's best interests for respondent-father's parental rights to be terminated. *Id*. at 713-714.

Affirmed.

/s/ Daniel S. Korobkin
/s/ Adrienne N. Young
/s/ Mariam S. Bazzi